# IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF ILLINOIS
### WESTERN DIVISION

| | | |
|---|---|---|
| Meagan Pettengell and Ryan Pettengell, | ) | |
| | ) | |
| Plaintiffs, | ) | Case No. 17 CV 931 |
| | ) | |
| v. | ) | |
| | ) | Judge Philip G. Reinhard |
| Roger Scott, Sheriff of DeKalb County, et al. | ) | |
| | ) | |
| Defendants. | ) | |

## ORDER

For the reasons stated below, plaintiffs' motion to strike affidavit of Sheriff Roger Scott [86] is denied. Defendants' motion for summary judgment [61] is granted. The case is terminated.

## STATEMENT-OPINION

This case arises out of plaintiffs Meagan Pettengell's and Ryan Pettengell's (hereinafter "plaintiffs") six-count complaint against defendants Roger Scott, Sheriff of DeKalb County, Gary Dumdie, Chief Deputy of DeKalb County, and DeKalb County (hereinafter "complaint"). *See* [1]. Plaintiffs' complaint stems from plaintiffs' employment with the DeKalb County Sheriff's Office and their allegations against defendants of discrimination. Count I alleges a violation of the Illinois Human Rights Act; Count II alleges a violation of Title VII of the Civil Rights Act of 1964; Count III alleges a First Amendment violation pursuant to 42 U.S.C. § 1983; Count IV alleges a violation of Equal Protection under 42 U.S.C. § 1983; Count V alleges conspiracy to deprive constitutional rights under 42 U.S.C. § 1983; and Count VI alleges a state law claim for indemnification.

On summary judgment, the court construes all facts and draws all inferences in the light most favorable to the non-moving party. *Schepers v. Commissioner, Indiana Dept. of Corrections*, 691 F.3d 909, 913 (7th Cir. 2012). The court does not weigh evidence or determine the credibility of witness testimony. *O'Leary v. Accretive Health, Inc.*, 657 F.3d 625, 630 (7th Cir. 2011). Instead, the court only grants summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). That said, Rule 56 "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

As a preliminary matter, the court addresses plaintiffs' motion to strike the affidavit of Sheriff Roger Scott. Plaintiffs state in their motion defendant Scott's affidavit contains

inadmissible hearsay.  For summary judgment, Federal Rule of Civil Procedure provides: "An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." FED. R. CIV. P. 56(c)(4).  Here, defendant Scott averred in his affidavit he has personal knowledge of information contained in investigation reports from his office involving patrol deputies and patrol supervisors identified by plaintiffs as comparators in support of their claims.  In their motion, plaintiffs provide a conclusory argument, with no factual or legal basis, to support their position that defendant Scott's affidavit contains inadmissible hearsay and should be disregarded by the court.[1]  For their part, defendants argue in response the affidavit is based on personal knowledge and is a review of the DeKalb County Sheriff's Office records of plaintiffs' identified comparators.  Defendants also point out the records attached to the affidavit (which provide the basis for defendant Scott's personal knowledge) are records not objected to by plaintiffs and which may be admissible under Federal Rule of Evidence 803(6) (a record "kept in the course of a regularly conducted activity of a business, organization…").  "[A]ffidavits…'constituted appropriate summary judgment evidence adequate to support a grant of summary judgment given that those affidavits were sworn to by employees…who were familiar with its record-keeping practices and therefore were qualified to speak from personal knowledge that the documents attached to the affidavits are admissible business records.'" *Thanongsinh v. Board of Education*, 462 F.3d 762, 777 (7th Cir. 2006) (citing *F.D.I.C. v. Patel*, 46 F.3d 482, 484 (5th Cir. 1995)).  Additionally, defendants argue defendant Scott's testimony concerning the reports of the comparators are not offered for the truth of the underlying facts contained in the reports, but to show how defendant Scott reacted in those incidents as compared to his reaction to plaintiffs' incident.  *See Woods v. City of Chicago* 234 F.3d 979, 986-988 (7th Cir. 2000) (arrest report and misdemeanor complaint not inadmissible hearsay at summary judgment stage because information was not offered for the truth but to show the effect the information had on the officers; district court properly found documents admissible as business records).  The court finds defendant Scott's affidavit to be based on personal knowledge and supported by admissible records of comparators identified by plaintiffs (not offered for the truth but to show the effect they had on defendant Scott's decisions) and not objected to by plaintiffs.  Therefore, plaintiffs' motion to strike affidavit of Sheriff Roger Scott is denied.

## A.    FACTUAL BACKGROUND

Plaintiff Meagan Pettengell has been employed as a patrol deputy with the DeKalb County Sheriff's Office since August 2012.  Since July 2010, plaintiff Ryan Pettengell has been employed as a patrol sergeant with the DeKalb County Sheriff's Office.  Plaintiffs have lived together since 2011 and were married on May 3, 2014.  Defendant Roger Scott has been the Sheriff of DeKalb County since 1985.  Defendant Gary Dumdie was deputy sheriff of the DeKalb County Sheriff's office at all times relevant to plaintiffs' claims.

---

[1]  *See Federal Deposit Ins. Corp. v. Meyer*, 781 F.2d 1260, 1268 (7th Cir. 1986) (court found party's response could not be construed as a motion to strike because it was "insufficient in that it failed to alert the district court to the alleged deficiencies in the moving party's affidavit supporting its motion for summary judgment.").

**Squad car claim**

In 1991 or 1992, defendant Scott implemented a vehicle deployment policy allowing patrol deputies to take home their squad cars. While not a written policy, defendant Scott had a longstanding practice of restricting two co-habitating deputies from taking their squad cars home to their shared residence. When plaintiff Meagan was transferred from communications to patrol in 2012, defendant Scott prohibited her from taking her squad car home. Plaintiff Meagan accepted the position in patrol with this restriction. Plaintiff Meagan testified the inability to take her squad car home is "highly inconvenient" because she must leave for work 10 minutes early when the weather is bad, cannot go off duty until her shift ends, has to remove her things from her squad car at the end of the day, has to clean her car at the office, and has to transfer her child's car seat from her car to her husband's car occasionally.

DeKalb County Sheriff's Office deputies Lindie Baumann and Brad Carls lived together at Baumann's residence in 2003 and 2004. During that period of time both Baumann and Carls took their squad cars home to the same residence. Baumann and Carls both testified Carls' Sheriff's Office vehicle was a marked squad. Carls testified during the time period he lived with Baumann (February 2003 until April 2004), Baumann's Sheriff's Office vehicle was unmarked. Baumann testified she believe Carls still lived with her in June of 2004 when she was re-assigned a marked squad car. Defendant Scott testified he did not know that Baumann and Carls were roommates in 2003 and 2004 until that information came out during this litigation. During the time Baumann and Carls lived together (2003-2004), defendant Dumdie did not know they lived together. The first defendant Dumdie heard Baumann and Carls took home their respective squad cars to the same residence was during the course of this litigation. Plaintiff states it was "common knowledge" that Baumann and Carls resided at the same residence and each took home a squad car.

According to her sworn affidavit, former DeKalb County Sheriff's Office deputy Katherine Christensen was a patrol officer from 1986 to 1988 and a member of the North Central Narcotics Task Force from 1988 to 1996, was not assigned a squad car and was never allowed to take a squad car home. She married a patrol sergeant with the DeKalb County Sheriff's Office in 1994.[2]

**Restricted duty assignment claim**

Plaintiff Meagan requested a restricted duty assignment on March 9, 2015, due to pregnancy. Defendant Scott advised plaintiff Meagan there was an opportunity for a restricted duty assignment in the corrections control room for the first two to three weeks of April 2015. Plaintiff Meagan was informed that after that there would be less actual need for hours to be filled in the control room. Plaintiff Meagan was the first patrol deputy that was provided a restricted duty assignment in corrections under defendant Scott's command. Other patrol deputies who needed a restricted or light duty assignment were allowed to take leave under the county's leave policy. Plaintiff Meagan agreed to the transfer to corrections control room

---

[2] Except for Christensen's assignments, plaintiff denies the statements concerning Christensen as inadmissible hearsay, but provides no motion or other reasoning to support this position. The court accepts Christensen's statements.

starting on March 31, 2015. Plaintiff Meagan worked in the control room until June 4, 2015 (and had June 5 through June 7 as scheduled days off). Plaintiff Meagan was put on paid administrative leave beginning on June 8, 2015, pending disciplinary action. During the week of March 29, 2015, plaintiff Meagan worked 45.5 hours and chose to take 9.5 hours of compensation time in lieu of overtime. During the week of April 19, 2015, plaintiff Meagan worked 44 hours. During the week of May 3, 2015, plaintiff Meagan worked 32 hours. There were no other open shifts in the control room that week and plaintiff Meagan took 8 hours of paid time off. During the week of May 31, 2015, plaintiff Meagan worked 47 hours. During all other weeks between March 31, 2015 and June 7, 2015, plaintiff Meagan worked 40 hours. Between March 29, 2015 and June 7, 2015, plaintiff Meagan averaged 39.9 hours in the corrections control room and earned the same rate of pay as she received as a patrol deputy. Plaintiff Meagan admitted the only damages relating to her restricted work duty claim was the 8 hours of paid time off she took the week of May 3, 2015, where only 32 hours of open shifts were available.

Plaintiff Meagan identified six comparators whom she believed were treated more favorably than her - Naomi Faivre, Carolyn Parnow, Timothy Boyd, Shane Davis, James Read, and Jacquelynn Hill. Jacquelynn Hill worked in the detective division in 2015; all other comparators worked in the corrections division. Faivre was placed on restricted duty from mid-November 2014 to mid-May 2015 and worked an average of 38.9 hours per week. Parnow was placed on restricted duty from mid-August 2014 through mid-September 2014 and worked an average of 36.4 hours per week. Boyd was placed on restricted duty from mid-June 2014 through mid-September 2014, took one week's vacation and worked an average of 40.5 hours per week. Davis was placed on restricted duty for two weeks in May of 2016. He worked 40 hours the first week and 44 hours the second week. Read was placed on restricted duty from late-August 2017 to late-September 2017 and worked an average of 41.66 hours per week. Hill was placed on restricted duty from mid-February 2009 to late August 2009 and worked an average of 33.93 hours. Hill was again placed on restricted duty for three weeks in November of 2015 and worked an average of 35.83 hours per week.

**High-speed pursuit and subsequent discipline**

On March 30, 2015, just before 1:00 a.m., plaintiff Meagan was on patrol duty and responded to a 911 call reporting a domestic incident. The 911 caller identified herself as the girlfriend of Jeffrey Nissen. She advised Nissen left her residence intoxicated and took her vehicle. Plaintiff Meagan spotted the vehicle matching the description provided by the caller and began following it. Plaintiff followed the vehicle westbound on Baseline Road, activated her lights and siren, and exceeded the posted 55 miles per hour speed limit. During the high-speed pursuit with suspect Nissen, plaintiff Meagan accelerated to 111 miles per hour. Nissen did not stop or pull over. At approximately 1:00 a.m., plaintiff Meagan reported to her supervisor, plaintiff Ryan, she was pursuing the suspect at 95 miles per hour. Plaintiff Ryan ordered plaintiff Meagan to terminate the pursuit. At approximately 1:01 a.m., plaintiff Meagan turned off her lights and siren, continued to follow Nissen through a stop sign at Annie Glidden Road at 80 to 85 miles per hour. Plaintiff Meagan continued to follow Nissen at speeds up to 107 miles per hour. At about 1:03 a.m., plaintiff Meagan was behind Nissen when Nissen crashed his vehicle into a utility pole. Nissen was transported to St. Anthony's Hospital in Rockford where

he was later pronounced dead. Defendant Dumdie learned of the pursuit and Nissen's death at approximately 3:00 a.m. Defendant Scott was on vacation on March 30, 2015 but spoke on the telephone with defendant Dumdie about the incident three or four times until defendant Scott's return from vacation April 9, 2015. Defendant Dumdie spoke with defendant Scott about some concerns he had with how plaintiff Ryan handled the incident and the press release plaintiff Ryan prepared. After defendant Scott returned from vacation, he had a conversation with DeKalb County deputies' union attorney about the Nissen incident and plaintiff Meagan's actions. Defendant Scott told the attorney he would consider transferring plaintiff Meagan and not bring termination charges but could not assign her back to patrol due to the Nissen pursuit as well as her prior discipline. Defendant Scott suggested plaintiff Meagan be reassigned to communications or be terminated. The union attorney attempted to talk plaintiff Meagan into an assignment with communications, but plaintiff Meagan would not agree to the assignment, believing her actions did not justify termination. Defendant Dumdie recommended to defendant Scott that plaintiff Meagan be disciplined in the form of termination and that plaintiff Ryan be demoted to rank of deputy, following the Nissen incident.

In May of 2015, Lieutenant Sullivan of the Sheriff's Office completed a report on the March 2015 Nissen incident and found that plaintiff Meagan had violated general orders and also noted in his report that plaintiff Meagan violated the office's pursuit policy in December of 2014 for conducing an unauthorized roadblock.

Also in May of 2015, defendant Scott received notice that plaintiff Meagan was no longer represented by the union's attorney. On May 27, 2015, defendant Scott served notices of interrogation on plaintiffs Meagan and Ryan. Five days later, plaintiffs Meagan and Ryan were separately interrogated about the Nissen incident, each with private counsel present. During his interrogation, plaintiff Ryan testified that he "expected" plaintiff Meagan to slow down when given the order to terminate the pursuit of Nissen. On June 8, 2015, plaintiffs Meagan and Ryan were placed on administrative leave with pay pending a June 10, 2015, pre-disciplinary meeting. On June 23, 2015, defendant Scott filed disciplinary charges before the DeKalb County Sheriff's Merit Commission (hereinafter "Merit Commission") against plaintiffs Meagan and Ryan, seeking a 60-day suspension for plaintiff Ryan and termination for plaintiff Meagan. Defendant Scott placed both plaintiffs on unpaid leave pending the outcome of the disciplinary proceedings. Defendant Scott believed that plaintiff Meagan's actions during the Nissen incident discredited the Sheriff's Office and gave the pubic the appearance that officers are disregarding the safety of the community. He also felt that putting plaintiff Meagan back in a patrol vehicle could create a safety issue for the community.

Beginning in September of 2015, the Merit Commission held a hearing on defendant Scott's charges against the plaintiffs. During the hearing, plaintiffs were represented by counsel, cross-examined witnesses, and called witnesses in their defense. On December 7, 2015, the Merit Commission found that just cause existed to discipline plaintiff Meagan on the charges of (1) conduct unbecoming an officer, (2) attention to duty, (3) mobile video/audio recording equipment, and (4) operation of police vehicles and equipment. The Merit Commission also found plaintiff Meagan violated an Illinois criminal code which requires drivers of emergency vehicles to drive with "due regard for the safety of all persons." The Merit Commission found just cause existed to discipline plaintiff Ryan for violation of the general order concerning

operation of police vehicles and equipment. On January 5, 2016, the Merit Commission ruled plaintiff Meagan would receive a 150-day suspension and plaintiff Ryan would receive a ten-day suspension.

Of the five comparators plaintiffs identify in their disciplinary claim, only three were involved in pursuits with speeds that exceeded 100 miles per hour. None involved a fatal accident. Besides plaintiff Meagan's March 30, 2015 pursuit, defendant Scott is not aware of any other pursuit in which a deputy continued to follow a suspect at speeds that exceeded 100 miles per hour after being ordered to terminate the pursuit. None of comparators identified by plaintiffs went through two stop signs during their pursuit at speeds exceeding 85 miles per hour (as did plaintiff Meagan). Also, no other deputy or sergeant at the Sheriff's Office had been involved in a high-speed pursuit that resulted in a suspect's death.

Prior to the Nissen incident, defendant Scott assigned plaintiff Ryan to the Special Operations Team (hereinafter "SOT"), and Illinois Law Enforcement Alarm System (hereinafter "ILEAS") team and later appointed him commander of the SOT. Defendant Scott took back plaintiff Ryan's assignments while plaintiff Ryan was on unpaid leave and during the Merit Commission hearing proceedings. Defendant Scott testified at his deposition that while plaintiff Ryan performed his supervisory duties fine, he was not comfortable having plaintiff Ryan in a position under circumstances where plaintiff Ryan might not tell him the facts as they are. Additionally, defendant Dumdie testified at his deposition that plaintiff Ryan should be removed from SOT and ILEAS because of training deficiencies and defendant Dumdie's perception that plaintiff Ryan was not completely honest during his interrogation regarding his and plaintiff Meagan's roles in the Nissen incident. On November 10, 2015, plaintiff Ryan was notified that he was removed from SOT and ILEAS. On November 16, 2015, defendants Scott and Dumdie received notice of the IDHR and EEOC charges brought against them by plaintiffs. While defendants Scott and Dumdie testified they had no knowledge plaintiffs were planning to file or had filed charges with IDHR or EEOC prior to plaintiff Ryan being removed from SOT and ILEAS, plaintiffs assert it was "common knowledge" they would be filing charges of discrimination.

## B. ANALYSIS

### 1. Discrimination claims under Illinois Human Rights Act, Title VII, and the Equal Protection Clause of the Fourteenth Amendment

The singular question in any employment discrimination case, whether brought under the Illinois Human Rights Act, Title VII, or the Fourteenth Amendment, is "whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused the discharge or other adverse employment action." *Ortiz v. Werner Enterprises., Inc.*, 834 F.3d 760, 765 (7th Cir. 2016). Under this analysis, the evidence "must be evaluated as a whole," *id*. at 766, and not sorted "into different piles, labeled 'direct' and 'indirect,' that are evaluated differently." *Id*. However, *Ortiz* did not reject or alter the burden-shifting approach articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), but instead uses it "as 'a means of organizing, presenting, and assessing circumstantial evidence in frequently recurring factual patterns found in discrimination cases.'" *Abrego v.*

*Wilkie*, 907 F.3d 1004, 1012 (7th Cir. 2018) (quoting *David v. Bd. of Trs. of Cmty. Coll. Dist. No. 508*, 846 F.3d 216, 224 (7th Cir. 2017)).

The *McDonnell Douglas* framework addresses whether a plaintiff has made out a *prima facie* case of discrimination. To succeed on a discrimination claim, plaintiff must establish "(1) she is a member of a protected class, (2) she was meeting the legitimate performance expectations of her employer, (3) she suffered an adverse employment action, and (4) another similarly situated individual not in the protected class was treated more fairly." *Swyear v. Fare Foods Corp.*, 911 F.3d 874, 883 (7th Cir. 2018). Under *McDonnell Douglas*, if plaintiff makes a *prima facie* showing, then the burden shifts to defendants to "present a legitimate, non-discriminatory reason for the challenged employment action." *Barbera v. Pearson Education, Inc.*, 906 F.3d 621, 629 (7th Cir. 2018). If defendant can carry this burden, then the burden shifts back to plaintiff to "show pretext, or at least to produce evidence establishing a genuine factual dispute about pretext to defeat summary judgment." *Id*.

Defendants do not contest that plaintiff Meagan is a member of a protected class based on her gender, and that her pregnancy and marital status are protected under the IHRA, and that plaintiff Ryan is protected based on his gender, and that his marital status is protected under the IHRA. Defendants do dispute that plaintiffs met the legitimate performance expectations of the defendants, that plaintiff Meagan suffered an adverse employment action (regarding her squad car and her reduced hours), and that plaintiffs have identified similarly situated individuals not in the protected class who were treated more fairly. The court analyzes plaintiffs' discrimination claims by topic.

**Squad car claim**

Plaintiffs assert plaintiff Meagan was discriminated against based on her marital status regarding defendants' policy prohibiting cohabitating deputies from taking their respective squad cars home. Defendants argue this does not qualify as an adverse employment action. "[T]he range of employer conduct that constitutes an adverse employment action is broad, but not unlimited." *Johnson v. Cambridge Industries, Inc.*, 325 F.3d 892, 902 (7th Cir. 2003) (citation omitted). A "material loss of benefits" can qualify as an adverse employment action "to the extent [it] effect[s] a quantitative or qualitative change in the terms or conditions of employment." *Id*. Additionally, "the employee must complain of some action on the employer's part that causes her to suffer a real harm." *Id*.

Plaintiffs argue plaintiff Meagan was the only deputy at the Sheriff's Office not permitted to start her shift from her home. As noted above, plaintiff Meagan was required to leave her home 10-15 minutes prior to the start of her shift, up to 30 minutes prior to her shift in inclement weather, to drive to the sheriff's office to retrieve her squad car. In addition, it took plaintiff Meagan extra time at the end her shift to drop off her squad car and go home. Plaintiff Meagan described this process at her deposition as "highly inconvenient." However, the Seventh Circuit has held that an adverse employment action "is one that is materially adverse, meaning more than a mere inconvenience." *Hilt-Dyson v. City of Chicago*, 282 F.3d 456, 465 (7th Cir. 2002) (citations and quotations omitted). Plaintiffs provide no additional facts or cite to any case law in support of their position that the "inconvenience" plaintiff Meagan suffered is enough to

constitute an adverse employment action. The court cannot find that the requirement that plaintiff Meagan's squad car had to be kept at the Sheriff's Office is a "quantitative or qualitative change" in her employment with the Sheriff. Additionally, even if plaintiff Meagan could show that her inability to take her squad car home is an adverse employment action, her comparators are not similarly situated to prove discrimination.

Plaintiff Meagan argues that deputies Brad Carls and Lindie Baumann shared a residence and took home their respective squad cars, in violation of defendant Scott's unwritten policy (in effect since the early 1990's) forbidding this practice.[3] Testimony revealed that Carls and Baumann lived together for about a year in 2003 and 2004 – a time period prior to plaintiff Meagan's employment at the Sheriff's Office. Defendants Scott and Dumdie testified they did not know – during that time period - that Carls and Baumann lived together. Defendant Scott testified he learned about this in 2015 (when plaintiffs filed their EEOC complaint), and defendant Dumdie testified he heard Carls and Baumann lived together many years after the fact and did not know they took their respective squad cars home to the same residence until plaintiffs' Merit Commission hearing in 2015. Plaintiffs attempt to overcome this testimony by asserting that it was "common knowledge" within the Sheriff's Office during 2003 and 2004 that Carls and Baumann lived together and took their squad cars home, and because defendant Scott "stands in the shoes" of his deputies that knowledge would be imputed to him. Outside of plaintiff Meagan, the only witness who testified to knowledge that Carls and Baumann lived together many years earlier and each took home a squad car, was (now) chief deputy Sullivan. Sullivan testified he did not tell defendant Scott or defendant Dumdie about the living arrangement of Carls and Baumann, nor did he know if defendant Scott or Dumdie was aware (in 2003-2004) Carls and Baumann each parked a squad car at the same residence. The court does not find this sufficient to show knowledge on the part of defendant Scott or defendant Dumdie and, therefore, does not find Carls and Baumann to be sufficient comparators. *See Sears, Roebuck & Co. v. N.L.R.B.*, 349 F.3d 493, 511 (7th Cir. 2003) (ALJ finding that "widespread belief" among employees at plant should be imputed to supervisor was "not supported by any evidence, much less substantial evidence."). The evidence does not permit a reasonable fact finder to conclude that plaintiff Meagan's marital status caused defendant Scott to prohibit her from taking home her squad car.

In her response brief, plaintiff Meagan further argues an inference can be made that defendant Scott enforced his unwritten policy regarding take-home squad cars against her based on her sex. In support of this argument, plaintiff Meagan states that assuming defendant Scott was unaware Carls and Baumann each took home a squad car to the same residence in 2003 and 2004, the facts demonstrate defendant Scott would inform deputies of the unwritten policy only *after* he became aware of a violation. And because he informed plaintiff Meagan of the policy *before* she had an opportunity to violate it (when he offered her the position in patrol), he discriminated against her based on her sex. This argument appears to be based on defendant Scott's testimony that a new deputy would be notified of the policy "if the circumstance were such and they – that they were living with somebody, they would be told directly." The court does not agree that this testimony means that a deputy would be informed of this policy only if a deputy had violated it. It is unsurprising, and not discriminatory, that defendant Scott told plaintiff Meagan in 2012 she could not take home her squad car, as she had been living with

---

[3] Plaintiffs provide no argument for the other named comparator – Kathy Christensen.

defendant Ryan (a sergeant in the patrol division) since 2011. The evidence does not permit a conclusion that defendant Scott discriminated against plaintiff Meagan based on her sex.[4]

**Reduced hours claim**

Plaintiff Meagan was placed on restrictive duty, due to pregnancy, from March 29, 2015, to June 7, 2015. During that time, plaintiff Meagan averaged 39.9 hours per week. She was assigned to the corrections control room, and her assignment was subject to the availability of shift hours. The heart of plaintiff Meagan's argument focuses on the week of May 2 through May 9, 2015, where she was not scheduled a full 40-hour work week and, therefore, was "forced" to utilize eight hours of banked time-off. Plaintiff Meagan argues she was discriminated against based on her pregnancy and her sex under the Illinois Human Rights Act and plaintiffs have specifically noted in their brief that this claim is against DeKalb County only. The court agrees with defendants that plaintiffs are not employees of DeKalb County but of the sheriff. *See Carver v. Sheriff of LaSalle County*, 243 F.3d 379 (7th Cir. 2001) (sheriff is a separate legal entity from the county). DeKalb County is a necessary party to the suit for indemnification purposes but is not liable to the plaintiffs. *National Casualty Co. v. McFatridge*, 604 F.3d 335, 345 (7th Cir. 2010). This aside, plaintiffs' claim is still not viable.

First, plaintiff Meagan requested, and received, a reasonable accommodation due to her pregnancy restrictions. As noted above, defendant Scott advised plaintiff Meagan he could provide her with a light duty assignment in the corrections control room but could not guarantee a full 40-hour work week due to the uncertainty of available shifts. An employee request for a physical work limitation cannot be considered adverse because "[i]t is the employer's prerogative to choose a reasonable accommodation; an employer is not required to provide the particular accommodation that an employee requests." *Jay v. Intermet Wagner, Inc.*, 233 F.3d 1014, 1017 (7th Cir. 2000). *See also Langreder v. Freeman Expositions, Inc.*, No. 13-cv-0371, 2016 WL 537953, at *5 (N.D. Ill. Feb. 11, 2016), *aff'd sub nom. Langreder v. Freeman Expositions, Ins.*, 679 F.Appx. 500 (7th Cir. 2017) ("When a plaintiff requests certain work restrictions that reduce the availability of work hours, it does not qualify as an adverse employment action."); *Hancock v. Potter*, 531 F.3d 474, 479 (7th Cir. 2008) (reduction of work hours due to lack of available work was not an adverse employment action); *Rehling v. City of Chicago*, 207 F.3d 1009, 1014 (7th Cir. 2000) ("It is well-established that an employer is obligated to provide a qualified individual with a reasonable accommodation, not the accommodation he would prefer."). Relatedly, the court does not find that a loss of eight hours of work time (over a ten-week time period) alters the terms and conditions of plaintiff's employment and rises to the level of an adverse employment action.

Second, in reference to her claim of discrimination based on her sex, plaintiff Meagan fails to persuade the court with her list of comparators. None of plaintiff's six comparators worked in the patrol division – five worked in corrections, and one worked in the detective division. Because there were no restricted duty positions available in patrol, defendant Scott

---

[4] Plaintiffs add to their argument that defendants violated her rights under Title VII of the Civil Rights Act by failing to compensate her for the additional time she must dedicate to comply with the squad car policy. However, the analysis under Title VII is the same – and the court fails to find that plaintiff's inconvenience rises to the level of an adverse employment action.

located, and plaintiff Meagan accepted, a restricted duty position in corrections.[5]  Because of this (and the difference in the nature of the work between these divisions), plaintiff's comparators are not "similarly situated."  However, even accepting plaintiff's comparators as "similarly situated," the court does not find that the number of working hours provided to the female and male employees provided with restricted duty assignments to be significant enough to raise a question of discrimination.  Plaintiff argues the female deputies were scheduled fewer working hours than the male deputies.  The male comparator with the highest number of hours averaged about 2.1 hours more than plaintiff Meagan.  While reduced pay may qualify as an example of an adverse employment action, the court finds plaintiff Meagan's 39.9 hours of work per week while on restrictive duty reasonable, and a 2.1 hours of work per week difference between plaintiff Meagan and the identified male comparator to be *de minimus*.  *See Ziccarelli v. Dart*, 581 F. Appx. 563 (7th Cir. 2014) (plaintiff "did not identify anything but trivial distinctions between himself and his coworkers" in his adverse employment claim).  This is especially true since plaintiff Meagan knew when she accepted the restrictive duty assignment in the corrections division that she may not be needed in a full-time capacity.  In her reduced hours claim, plaintiff has failed to show she was subject to an adverse employment action or that she was able to identify similarly situated comparators.

**Plaintiffs' disciplinary action claims**

Plaintiffs next argue plaintiff Meagan was unfairly disciplined by defendants based on her sex and marital status and plaintiff Ryan was unfairly disciplined by defendants based on his marital status, in relation to plaintiff Meagan's high-speed pursuit and consequential death of Nissen.  Plaintiffs have the burden to show they met the performance expectations of defendants and that similarly situated individuals outside their protected class were treated more fairly.

Preliminarily, the court acknowledges that it was the Merit Commission, not defendants, who made the final decision regarding plaintiffs' discipline.  Following a hearing, the Commission made findings of fact and concluded that both plaintiffs violated various general orders and policies and ordered a 150-day suspension for plaintiff Meagan and a ten-day suspension for plaintiff Ryan.  Plaintiffs did not appeal the Commission's findings and admitted the Commission did not discriminate against them or act with discriminatory intent.  The plaintiffs bring these claims against the Sheriff's Office defendants.

**Plaintiff Meagan**

First, and related to plaintiff's disciplinary action claims, plaintiff Meagan argues defendant Dumdie targeted her by conducting his own premature investigation of the Nissen incident and ordering that the accident investigator not pull the data recording device from Nissen's vehicle following the crash.  According to plaintiff Meagan, defendant Dumdie focused his investigation on the speed and stopping distance of her squad car for the purpose of recommending discipline against her, even before he spoke with her.  Plaintiff also repeats that it

---

[5]  Plaintiff Meagan was the first patrol deputy to be given a restricted duty assignment.  Prior to defendant Scott placing plaintiff Meagan in a light duty assignment in the corrections division, patrol deputies and sergeants who needed light duty could take a leave of absence under DeKalb County's leave policy.

was "unusual" for defendant Dumdie to perform such an investigation and, therefore, an inference can be made his investigation was conducted against plaintiff Meagan because of her sex. Plaintiff Meagan provides no case law to support this position. Even if the court agreed with plaintiff's assessment that defendant Dumdie conducted a premature, undocumented, even violative investigation of plaintiff Meagan in order to set her up for discipline, the court cannot see how an "inference" could then be made that this was done against her due to her gender. This argument fails.

Next, plaintiff Meagan argues defendant Scott sought to discipline her more harshly than her counterparts. As comparators, plaintiff offers deputy Parnow, deputy Deuhning, and deputy Delisio. Deputy Parnow was involved in a pursuit of a suicidal subject. When his supervisor ordered him to terminate his pursuit of the suspect, deputy Parnow acknowledged the order, deactivated his lights, slowed down his vehicle and, according to defendant Scott at his deposition during the Merit Commission hearing, drove safely, maintaining a moderate speed. Neither Parnow nor his supervisor was disciplined. Deputy Deuhning was involved in a pursuit through the city of Sycamore's business district at speeds of about 50 miles per hour. The suspect crashed into the back of a garbage truck resulting in the suspect being transported to the hospital. Deputy Deuhning then drove to the hospital in a reckless manner, nearly causing an accident. The suspect did not die from his injuries. Deputy Deuhning was the acting supervisor at the time and was not disobeying a direct order in relation to his pursuit. Defendant Scott determined deputy Deuhning violated the office's pursuit policy and removed his shift supervisor eligibility for three months. In 2013, in pursuit of a suspected motorist under the influence, deputy Delisio traveled at a speed of 100 miles per hour before making notification of his pursuit and continued to pursue the suspect at a speed of 122 miles per hour (he did not disobey an order to terminate the pursuit). After stopping the suspect and while conducting his investigation, deputy Delisio failed to activate his microphone, in violation of the department's policy. Defendant Scott testified he first became aware of this incident at plaintiffs' Merit Commission hearing in 2015. Plaintiff Meagan also argues her review of 92 videos of patrol deputies initiating traffic stops and conducting investigations of suspected impaired drivers from January 1 to July 1, 2015, revealed all but one deputy failed to comply with the department's video/audio policy, and except for plaintiff Meagan, defendant Scott did not disciple any patrol deputy in relation to that policy.

Defendants argue plaintiff Meagan fails to meet her burden to show the comparators were similarly situated.[6] "[S]imilarly situated employees must be directly comparable to the plaintiff in all material respects….The purpose of the inquiry is to eliminate other possible explanatory variables, such as differing roles, performance histories, or decision-making personnel, which helps isolate the critical independent variable – discriminatory animus." *Skiba v. Illinois Central Railroad Co.*, 884 F.3d 708, 723 (7th Cir. 2018) (citations and quotations omitted). "In the usual

---

[6] Defendants also argue that prior to plaintiff Meagan, no other employee at the Sheriff's Office had been involved in a high-speed pursuit that resulted in a suspect's death. Additionally, in 2014, plaintiff Meagan received a one-day suspension for violation general orders regarding a pursuit. As noted by defendants, "[e]mployers are justified in reprimanding employees more severely for repeated errors." *Atanus v. Perry*, 520 F.3d 662, 675 (7th Cir. 2008).

case a plaintiff must at least show that the comparators (1) dealt with the same supervisor, (2) were subject to the same standards, and (3) engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them." *Id*. None of the three comparators offered by plaintiff – Parnow, Deuhning, Delisio – meet her burden of similarly situated employees. Likewise, the court is not persuaded by the "92 videos" of patrol deputies violating the defendants' video/audio policy as that fact falls far short of plaintiff Meagan's burden to show the employees are "comparable to the plaintiff in all material respects." There must be "enough common factors between a plaintiff and a comparator…to allow for a meaningful comparison in order to divine whether discrimination was at play." *Barricks v. Eli Lilly and Co.*, 481 F.3d 556, 560 (7th Cir. 2007). Neither plaintiff Meagan's specific comparators nor general statistics are sufficient to show defendants discriminated against her based on her sex by seeking to discipline her more harshly.

**Plaintiff Ryan**

Plaintiff Ryan also argues defendant Scott sought to discipline him "because he was married to [plaintiff] Meagan." The argument is limited to defendant Scott's sought-after punishment against plaintiff Ryan under the "compliance" sections of the same policies regarding defendant Scott's suggested punishment of plaintiff Meagan – specifically, general orders regarding personal conduct, video/audio recording, operation of police vehicle, and pursuit. Plaintiff argues an inference can be made that plaintiff Ryan was disciplined under the "compliance" sections of the general order because he was married to a subordinate who violated the orders. According to plaintiff, this inference is based on the fact that defendant Scott sought to discipline plaintiff Ryan despite plaintiff Ryan being unaware that plaintiff Meagan was violating the general order during the Nissen incident, no other supervisor in the department is married to a subordinate, and no other supervisor in the department was disciplined under the "compliance" sections of the general orders as a result of his subordinate violating the same orders. As an example, plaintiff points to the 92 videos of patrol deputies following suspected impaired drivers where all but one violated the video/audio recording general order, yet no deputy in the group was disciplined by defendant Scott.

Defendants argue plaintiff Ryan mischaracterizes the facts. Plaintiff Ryan asserts defendant Scott alleged that he was disciplined for failing to ensure plaintiff Meagan followed his orders, failing to properly supervise plaintiff Meagan during her pursuit of Nissen, failing to give truthful answers at his interrogation, failing to appreciate the gravity of plaintiff Meagan's actions when he testified, and failing to apply his pursuit training. In other words, plaintiff Ryan did not accurately set forth the scope of defendant Scott proposed discipline against him. Defendants also argue, regarding the "compliance" order violations, that plaintiff Ryan was charged under these sections because he knew, or should have known, of the violations committed by plaintiff Meagan, his subordinate. In relation to the 92 videos of investigations and violations of the video/audio regarding general order, defendants repeat their argument that plaintiff Ryan fail to meet his burden that these deputies are "similarly situated."

Accepting plaintiff Ryan's argument as discrimination based on marital status (and not based on plaintiff Ryan being married to a subordinate), plaintiff Ryan must show he met the performance expectations of defendants and that similarly situated individuals outside his

protected class were treated more fairly. Taking the facts as a whole, including the nature of the discipline set out by defendant Scott against plaintiff Ryan based on his involvement in the Nissen incident, the evidence does not show that plaintiff Ryan was meeting defendants' legitimate performance expectations. Additionally, the facts show plaintiff Ryan had been disciplined previously for failure to properly supervise a dispute. Plaintiff Ryan cannot meet his burden. As to a showing of similarly situated employees, as noted above, not only has plaintiff Ryan failed to provide support for his argument that the deputies in question in the 92 videos and their respective circumstances were comparable in "all material respects," they have not shown these "comparables" are similar in *any* respect. *Barricks,* 481 F.3d at 560.

Finally, even if plaintiffs could show that they met their employer's legitimate job performance expectations and similarly situated unmarried employees were treated more fairly, they have failed to show that the discipline sought after by defendant Scott was pretextual. Courts are concerned with whether "the employer's reasons for its decision are honest and genuinely motivated…[not] with whether or not the employer's actions were mistaken, ill considered or foolish, so long as the employer honestly believes those reasons." *Burks v. Wisconsin Dept. of Transp.*, 464 F.3d 744, 754 (7th Cir. 2006) (citations and quotation omitted). The court finds the evidence shows that the discipline defendant Scott recommended to the Merit Commission against both plaintiff Meagan and plaintiff Ryan was "genuinely motivated" and not a pretext for discrimination based on the marital status of the plaintiffs or plaintiff Meagan's gender. Plaintiffs have failed to present evidence otherwise.

## 2.    Retaliation claims in violation of the First Amendment

Count III of plaintiffs' complaint alleges a violation of the First Amendment against all defendants. Specifically, plaintiffs clearly allege in their complaint defendants denied them their right to *free speech* under the First Amendment by retaliating against them after they retained private counsel to represent them in their disciplinary proceedings and for filing charges with the IDHR and EEOC. *See* [1] at ¶¶ 65-70. However, in their response brief, plaintiffs state that they are alleging defendants violated their right to *petition and associate* under the First Amendment. The court agrees with defendants that it is improper for plaintiffs to change the nature of their claims in their response brief. "'[A] party may neither amend its pleadings by argument in opposition to summary judgment nor introduce new theories of liability in opposition to summary judgment.'" *Colbert v. City of Chicago*, 851 F.3d 649, 656 (7th Cir. 2017) (quoting *Whitaker v. Milwaukee Cty., Wis.*, 772 F.3d 802, 808 (7th Cir. 2014)); *see also Shanahan v. City of Chicago*, 82 F.3d 776, 781 (7th Cir 1996) ("A plaintiff may not amend his complaint through arguments in his brief in opposition to a motion for summary judgment."). Regardless, the court will consider plaintiffs' First Amendment claim premised under the theory of a right to petition and associate.

"While the speech at issue in government employment cases often involves…remarks by employees in the workplace…the First Amendment reaches many forms of expression." *Hagan v. Quinn*, 867 F.3d 816, 822 (7th Cir. 2017). Citing to the United States Supreme Court case of *Borough of Duryea v. Guarnieri*, 564 U.S. 379 (2011), the Seventh Circuit in *Hagan* noted that in reviewing First Amendment claims under the petition clause, plaintiffs can "just as easily" allege that their employers are retaliating against them for speech contained in petitions (eg.

grievances or lawsuits). *Hagan*, 867 F.3d at 822. *Borough of Duryea* held that "the ordinary framework for assessing retaliation claims applies with equal force when the speech at issue is conveyed through a lawsuit or other petition." *Id.* The Supreme Court found that the approach "to apply the public concern test developed in Speech Clause cases to Petition Clause claims by public employees…is justified by the extensive common ground in the definition and delineation of these rights." *Borough of Duryea*, 564 U.S. at 389. And under the test established in *Connick v. Myers*, 461 U.S. 138, 146-47 (1983), a public employee has no First Amendment claims unless he or she was speaking on a matter of public concern. "[W]hen a public employee speaks not as a citizen upon matters of public concern, but instead as an employee upon matters only of personal interest…a federal court is not the appropriate forum in which to review the wisdom of a personnel decision taken by a public agency allegedly in reaction to the employee's behavior." *Id.* at 147.

Plaintiffs do not address the "public concern" requirement, but simply state that defendants' analysis of the issue under *Connick* is misplaced. In support of their position, plaintiffs cite to *Denius v. Dunlap*, 209 F.3d 944 (7th Cir. 2000). In *Denius*, plaintiff contended that his employer requiring him to sign a waiver of his attorney-client privilege as a condition of his employment violated his First Amendment rights of speech, association and petition. *Id.* at 954-55. Plaintiffs rely on *Denius* for the proposition that the First Amendment protects a person's right to consult with an attorney on any legal matter. Plaintiffs also cite to *Carreon v. Illinois Dept. of Human Services*, 395 F.3d 786 (7th Cir. 2005), for the same proposition. Citing *Denius*, *Carreon* acknowledges a governmental employee's right to associate with his counsel on matters of private concern. *Id.* at 795-96. However, the *Carreon* court held "the freedom of association guaranteed by the First Amendment…did not confer upon [plaintiff] the unconditional right to bring counsel to an internal investigational interview," and, therefore, plaintiff there failed to establish he had engaged in conduct protected by his right of association. *Id.* at 797.

Here, plaintiffs did not petition or associate regarding any issue of public concern. Plaintiffs' actions in hiring private counsel to represent them in their disciplinary proceedings and their filing of claims with the IDHR and EEOC were motivated by and a consequence of their private, internal employment matters with the Sheriff's Office. The court is not persuaded that the *Denius* case relied upon by plaintiffs can be read to apply to plaintiffs' circumstances, and to the extent *Carreon* provides support to plaintiffs, *Carreon* is not unlimited (no unconditional right to bring counsel to internal investigation) and further holds there was "no evidence that defendants sought to deprive [plaintiff] of the benefits of his counsel's views." Plaintiffs' argument that the timing of defendants' disciplinary and other employment decisions against them prove retaliation in violation of the First Amendment, is speculative and unconvincing. As noted by defendants, defendant Scott, defendant Dumdie and Lieutenant Sullivan began discussions regarding potential discipline against plaintiff Meagan immediately after the Nissen incident. Additionally, plaintiff Meagan rejected her union attorney's suggestion that she accept a position with communications in lieu of termination – all prior to her hiring private counsel. Defendant Scott proceeding thereafter with formal disciplinary charges with the Merit Commission can hardly be linked to his knowledge of plaintiff Meagan hiring private counsel. Regarding plaintiff Ryan, he too was the subject of potential discipline immediately following the Nissen incident. Plaintiff Ryan's union attorney also discussed with defendant

Scott discipline for plaintiff Ryan short of termination (prior to the hiring of private counsel). Also, the facts show plaintiff Ryan was removed from the SOT and ILEAS teams prior to defendant Scott's knowledge of plaintiffs' charges of discrimination with the IDHR and EEOC. Any perceived link between plaintiffs' hiring of private counsel, as well as the filing of claims with IDHR and EEOC, and defendants' recommended discipline against them, is conjecture and speculation, and does not rise to the level of a constitutional violation.

3.      **Conspiracy claim; *Monell* claim; Claim against defendant Dumdie individually; and Qualified immunity**

The court need not address defendants' arguments they are entitled to summary judgment as to plaintiffs' conspiracy claim, *Monell* claim, and claim against defendant Dumdie individually, because plaintiffs have failed to address these arguments in their brief.  *See Palmer v. Marion County*, 327 F.3d 588, 598 (7th Cir. 2003) ("[A]rguments not presented to the district court in response to summary judgment motions are waived." (citing *Laborers' Int'l Union of N. Am. v. Caruso*, 197 F.3d 1195, 1197 (7th Cir. 1999))).

Additionally, because the court has found that the individual defendants – defendant Scott and defendant Dumdie – have not violated plaintiffs' First or Fourteenth Amendment rights, the court finds defendants' arguments that they are entitled to qualified immunity moot.

C.      **CONCLUSION**

For the reasons stated above, plaintiffs' motion to strike affidavit of Sheriff Roger Scott [86] is denied.  Defendants' motion for summary judgment [61] is granted.  The case is terminated.

Date: 03/26/2019                          ENTER:

                                          _Philip G. Reinhard_
                                          _____
                                          United States District Court Judge

                                          Electronic Notices. (LC)